**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**DECLARATION IN SUPPORT OF VERIFIED COMPLAINT**

Under 28 U.S.C. § 1746, I, Alexander W. Smith, Task Force Officer ("TFO"), Drug Enforcement Administration ("DEA"), United States Department of Justice, make the following unsworn declaration, under the penalty of perjury, pertinent to the Verified Complaint to which this Declaration is attached:

I.   **INTRODUCTION**

1. This declaration is made in support of a Verified Civil Complaint for forfeiture of property seized pursuant to an airport interdiction. There is probable cause to believe that the property is involved in and/or represents the proceeds of drug trafficking and/or a conspiracy to commit drug trafficking, in violation of 21 U.S.C. §§ 841 and 846 and is therefore subject to forfeiture under 21 U.S.C. § 881(a)(6).

2. This declaration is based upon my personal knowledge and experience obtained as case agent in this case and information I have received from other law enforcement officials.

II.   **DECLARANT'S BACKGROUND AND EXPERIENCE**

3. I am a Police Officer with the Pascagoula Police Department, assigned to the DEA as a TFO since August 2018. I have served as a sworn law enforcement officer in the State of Mississippi for more than six years. I graduated from the Harrison County Law Enforcement Training Academy in 2016 and have since received extensive training in relation to the investigation of illegal drug trafficking by virtue of my employment with the Pascagoula Police Department and assignment with DEA. My training has included narcotics investigations, hotel,



motel, and parcel interdiction, drug search warrants, financial investigations related to drug trafficking, money laundering, asset forfeiture and seizure, and social media analysis.

  4.  I have participated in and conducted multiple investigations which have led to the arrest and conviction of individuals who have been involved in the smuggling, receiving, and distribution of controlled substances, as well as the seizure of illegal drugs and proceeds derived from the sale of those illegal drugs. In addition, I have conducted, in connection with these and other cases, investigations concerning the concealment of narcotics-produced assets, money, bank records, etc., and the identification of drug-trafficking co-conspirators via ledgers, telephone bills and records, and photographs. I have been involved in various types of electronic surveillance, in the execution of search warrants, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

  5.  Through training and experience, and through the training and experience of other narcotics agents with whom I have talked, I have learned the following:

  a.  That criminal organizations, including large-scale drug traffickers, maintain and handle large amounts of United States currency to finance their ongoing illicit businesses;

  b.  That traffickers often bundle their illegal proceeds for interstate transport or source destinations in order to make it easier to transport and more difficult for law enforcement canine units to detect trace amounts of illegal drugs which have touched the drug proceeds. It may be shrink-wrapped in plastic and/or wrapped in aluminum foil and may also be bundled by rubber band in thousand-dollar increments. The bundled cash may be concealed in clothing or luggage or hidden in mechanical or electronic traps of a vehicle, depending on the sophistication of the smugglers' organization;

  c.  That it is a common practice for large-scale drug traffickers to travel to distribution and source areas to facilitate their trafficking; that after



      purchasing drugs, the drug trafficker will transport, or cause to be transported, drugs to other areas for distribution; and that the methods of transportation include, but are not limited to, rental and privately-owned automobiles and/or private or commercial planes;

d.   Los Angeles, California and the surrounding area is a major source of narcotics, including marijuana, crystal methamphetamine, and fentanyl to Southern Mississippi.  Generally speaking, proceeds derived from the sale of narcotics and currency used to pay for large quantities of narcotics are transported as bulk currency via persons and packages to such source cities;

e.   That money couriers and those with illegally obtained proceeds often attempt to justify their possession of bulk currency by claiming that the currency is the proceeds of legal cash-based self-employment.  Such individuals are often unable to substantiate their claims with business records;

f.   That drug traffickers, when encountered by interdiction agents, frequently provide agents with explanations for their travel—in an attempt to cover up the illicit nature and purpose of their travel—that are inconsistent with facts known to or discovered by agents;

g.   That, because drug traffickers can come from a range of backgrounds and demographic groups, they cannot be successfully profiled by gender, race, age, or style of dress.  Rather, agents are trained to look at factors such as the subjects' ticket and luggage characteristics, and the subjects' own behavior.  These factors include, but are not limited to: (1)  Changes to a ticket shortly before departure, generally related to the time of the flight, rather than the destination; (2) A ticket paid for with a prepaid card or mobile payment service, such as Cash App or Venmo; (3) Travel to/from source and distribution locations; (4) There are too many or too few bags (and/or clothing within those bags) in relation to the length of the trip; (5) Multiple cell phones and/or multiple SIM cards with one phone; (6) Subjects' nonverbal indicators of stress, such as excessive sweating, trembling, repeated licking of the lips, fidgeting, and inappropriate smiling or laughing; and (7) Subjects' verbal behaviors, such as a shaky voice, and avoidance or deflection of questions;

h.   That drug traffickers use social media platforms, such as Facebook, Snapchat, YouTube, and Instagram, to facilitate their business and/or brag about their financial success.  Payments between a dealer and buyer or a dealer and a source can either be made by a variety of means, including,

**EXHIBIT A**

        but not limited to cash, through a mobile payment service, wire transfers, or an exchange of valuable assets;

i. That the courts have recognized unexplained wealth is probative evidence of criminal violations by pecuniary gain, in particular trafficking in controlled dangerous substances (*see United States v. Barnes*, 604 F.2d 1 21, 147 (2 Cir. 1979)); and

j. That courts rely on a multitude of factors in determining whether seized property is substantially connected to illegal drug activity, including, but not limited to: (1) a large quantity of unexplained cash, primarily consisting of bills in smaller denominations ($20 and less); (2) travel to a source city by an individual with a track record of prior involvement with drugs and firearms; (3) the packaging of the currency; (4) whether the currency was hidden or concealed; (5) the behavior of the individual in possession of the currency, including the individual's explanation for possessing the currency, whether the individual denied possessing the currency, and whether the individual appeared nervous or changed stories; (6) the individual's false, conflicting, and implausible statements during his interaction with the officer; (7) the individual's travel schedule and arrangements; (7) the presence of marijuana (or other drugs') residue; (8) whether a trained narcotics dog alerted to the currency or the location in which the currency was discovered; (9) the possession of multiple cell phones, particularly inexpensive "burner" phones; and (10) photographs and messages contained on cell phones that suggest drug trafficking and other illegal activities.

## III. ITEMS TO BE FORFEITED TO THE UNITED STATES OF AMERICA

6. The Defendant Property includes the following assets seized from Anterio Dillard ("Dillard") on September 27, 2022, at Gulfport-Biloxi International Airport[1]:

| No. | Asset ID | Asset Description |
|---|---|---|
| A-001 | TBD | One (1) Cartier Santos watch, two-tone gold and diamond, valued at $39,500.00 |
| A-002 | TBD | One (1) 10k rose gold fashion ring, weighing 16.4 grams with 303 round diamonds totaling 4.51ct, valued at $5,574.00 |
| A-003 | TBD | One (1) 10k rose gold fashion ring, weighing 10.3 grams with 205 round diamonds totaling 1.08ct, valued at $2,264.00 |

---

[1] Officers also seized $22,705.00 U.S. Currency (22-DEA-696416) from Dillard. The DEA is in the process of administratively forfeiting this currency, but if a valid administrative claim is filed, the United States will file an amended verified complaint to include it.


**EXHIBIT A**

| A-004 | TBD | One (1) 10k rose gold fashion ring, weighing 20.2 grams with 136 baguette diamonds totaling 3.45ct, 132 round diamonds totaling 2.11ct, valued at $7,389.00 |
|---|---|---|
| A-005 | TBD | One (1) 10k rose gold fashion ring, weighing 48.4 grams with 109 Baguette diamonds totaling 1.92ct, 1114 round diamonds 14.88ct, 48 pink cubit zirconias, total diamond weight 16.80ct, valued at $20,802.00. |
| A-006 | TBD | One (1) 10k rose gold link 8.75" chain bracelet, weighing 48.1 grams with 382 round diamonds totaling 7.05ct, 1267 round diamonds totaling 6.34ct, valued at $17,913.00 |
| A-007 | TBD | One (1) 10k rose gold link 8.25" chain bracelet, weighing 25.3 grams with 386 round diamonds totaling 6.76ct, valued at $7,943.00 |
| A-008 | TBD | One (1) 10k rose gold link 8" chain bracelet, weighing 45.0 grams with 710 round diamonds totaling 10.65ct, valued at $12,837.00 |
| A-009 | TBD | One (1) 10k rose gold curb 22.50" chain necklace, with 1612 round diamonds totaling 40.19cts, valued at $53,765.00 |
| A-010 | TBD | One (1) 10k rose gold pendant, weighing 125.5 grams with 1989 round diamonds totaling 21.40ct, 533 round pink cubic zirconias, valued at $33,050.00 |
| A-011 | TBD | One (1) 10k rose gold pendant with 268 Baguette diamonds totaling 5.36ct, 655 round diamonds totaling 10.26ct, diamond weight total is 15.62cts. Pendant says "ITSTO." Valued at $19,487.00. |
| A-012 | TBD | One (1) 10k rose gold link, 24.25" chain necklace with 1272 Baguette diamonds totaling 14.40ct, and 2,140 round pink cubic zirconias, valued at $45,435.00. |

### IV. PROBABLE CAUSE

#### A. Initial Contact with Dillard and Shiniqua Thomas ("Thomas")

7. On September 27, 2022, DEA Gulfport Resident Office Special Agent ("SA") Adrien Thomas, TFO Marcus Jassby, and I were conducting airport interdiction operations at the Gulfport-Biloxi International Airport when we received a tip about two passengers on a specific flight from a confidential source ("CS")[2]. The tip allowed the other officers and I to conduct a

---

[2] This CS, known to me only by his or her CS number assigned by the DEA, has consistently provided DEA with reliable information for several years. The CS identified two individuals—Anterio Dillard and Shiniqua Thomas—and an unrelated passenger on the same flight. The tip on the unrelated passenger also proved reliable, as that subject had bulk cash that he admitted he intended to use to purchase drugs.



preliminary investigation[3] before we approached Dillard and Thomas—identified through their Mississippi Driver's Licenses—after they exited the Transportation Security Administration ("TSA") screening line.

8. The other officers and I asked Dillard and Thomas if they would voluntarily speak with us away from the TSA exit point. Both subjects agreed and followed us to a public area near Gate Four.

9. Responding to a question about where they were traveling, Dillard advised that he and Thomas were going to California, specifically "L.A.," for a vacation. Dillard stated that he flew "all the time." SA Thomas asked Dillard and Thomas if they were travelling with any narcotics, firearms, or large sums of currency, and Dillard responded that he was travelling with a "large sum of money." As he spoke, I observed that Dillard's face had grown pale, and he appeared a little shaky. Additionally, he was beginning to perspire excessively, to the point that sweat was running down his face despite the cool temperatures in the airport gate area.

10. I asked Dillard how he had paid for his tickets. He advised he used his CashApp card. I then asked about his return flight, and Dillard advised that he did book a return flight, but subsequently found someone in California selling a dog that he was interested in purchasing, and so he told Thomas they "might as well stay for a whole week."

11. Dillard and Thomas gave verbal and written consent for agents to search their bags: a large black duffel bag, a small brown backpack, and a large suitcase belonging to Dillard, which all smelled strongly of marijuana, and a brown zippered suitcase and a small red bag belonging to Thomas. Thomas' bags contained only a single change of clothes and toiletries, but no cash, jewelry, or contraband.

---

[3] The DEA also initiated a criminal investigation into Dillard and Thomas as a result of the tip.

**EXHIBIT A**

12. The black duffel bag contained various toiletries and a rolled-up pair of sweatpants with a pair of loose socks and a pair of underwear still inside them, as if Dillard had just been recently wearing them. I found a large roll of rubber-banded U.S. currency in the left pants pocket, and another roll in the right pants pocket.

13. SA Thomas searched the brown suitcase and located several stacks of U.S. currency also secured with rubber bands, along with multiple pieces of gold jewelry including rings, necklaces, and bracelets covered in diamonds, which Dillard said was "real." SA Thomas further located a zip-lock tobacco bag containing three (3) rolled marijuana cigarettes.

14. I asked Dillard about the cash and Dillard claimed that it was about "$13,000" and stated that most of it belonged to him, but that about "$5,000" belonged to his brother. Dillard stated that his brother had withdrawn the $5,000 from the bank in the past few days.

15. I asked Dillard where his cash came from, and he advised he had it kept in a safe. I asked why the cash was all in rolls or stacks and all held together with rubber bands instead of bank envelopes, and Dillard stated he didn't keep the cash in envelopes and kept it all in bands.

16. Dillard told me "I sell dogs" and explained that he purchased dogs to breed and ran a company with his brother, Eric Phillips. Dillard advised they had two LLCs, "ZaZa Kennels" and "Cutthroat Bullies Exotic Kennels."

17. Dillard claimed he made $40,000 per year with his business. When I advised that a yearly income of $40,000.00 seemed low for someone travelling with $13,000 cash on vacation, Dillard stated, "Well I also cut grass" and further advised that he was a "rapper."

18. I asked if Dillard had any media presence as a rapper, and Dillard advised he had a YouTube page with about "30,000 views."

**EXHIBIT A**

19. When I asked if Dillard could provide any information relating to his dog breeding business, he hesitated and then pulled his phone out of his pocket. I asked if he had photographs of the dogs on his social media profile, for-sale listings, promotional posts, or any other similar online presence that would corroborate his statements. Dillard did not seem to have an answer for this and continued to scroll through his phone for several minutes. He then showed me an Instagram social media page with photographs of French Bulldogs and other dogs on a dog-breeding page.

20. I asked what the money was for, and Dillard advised that he and Thomas were going to "look at a dog" while they were on vacation, explaining that they were going to meet up with a subject in California who was selling a dog for $25,000. I asked Dillard how he was going to pay that much for the dog when he had told me that he had $13,000 cash. Contradicting his earlier statement, Dillard now claimed the entire $13,000 was his, and with the $5,000 from his brother and some "extra" he thought he had, it was probably a total of $20,000 in his bags. Dillard stated that he intended to negotiate the price with the subject since he did not have $25,000. He advised that sometimes when you show people cash, they will drop the price.

21. I asked how Dillard planned to get the dog back to Mississippi and he stated, "I'll take him on the plane, I guess." When I questioned why he said, "I guess," which indicated he was inexperienced with purchasing and transporting dogs, Dillard stated he was being "sarcastic," although his demeanor and tone indicated he was nervous and unsure about his answers. Dillard advised he had not done "this" (*i.e.*, purchasing a dog that had to be transported by plane) before.

**EXHIBIT A**

22.      I asked who was selling the dog in California, and Dillard stated it was "David Rolling, or Roller" but that he could not exactly remember. He advised that he communicated with the subject via his brother's Instagram account.

23.      Asked where he was planning to stay in Los Angeles, Dillard claimed to be staying at an Airbnb, but didn't know where it was located, and that one of his friends had purchased it for him. Dillard refused to show proof of the Airbnb reservation.

24.      I asked Dillard why he and Thomas had brought no more than a day's worth of clothes each when they intended to stay an entire week. Dillard advised that they were going to buy the rest of the clothes they needed when they arrived. Since Dillard had already admitted that they already did not have enough cash to cover the cost of the dog he wanted to purchase, and based on their current attire, they were likely not going to purchase cheap or used clothing, I questioned Dillard's plan. Dillard responded that they could buy a lot of clothes for $500 and stated they would probably "go to Walmart."

25.      I asked Dillard about his criminal history, and he stated he had been arrested before for drug-related charges and advised that he was a convicted felon.

26.      Dillard initially stated he did not file taxes but that he was "going to" file taxes for the current year since his company had income now. He then claimed he did file taxes for 2021.

27.      TFO Jassby and I spoke with Thomas to ask her about Dillard, and she claimed that Dillard made some money working events as a rapper, mostly performing at small shows and proms, where he might make up to $1,500 for a show. Thomas advised she had been with Dillard on some jobs in Jackson, Mississippi, and identified Dillard's phone number as (910) 358-2354.

**EXHIBIT A**

28.     Thomas told me she worked as a Certified Nursing Assistant and had been working locally for a long-term care facility but was currently unemployed. She admitted that she and Dillard both smoked marijuana.

29.     Hancock County Sheriff's Office Deputy Chase Blackwell was present with his department K-9, "Dark," to conduct an olfactory inspection of Dillard's luggage. Officers had placed Dillard's luggage (containing the Defendant Property) in a room with other items as "decoys." Deputy Blackwell and K-9 Dark did not see where we placed Dillard's luggage. At approximately 1:30 p.m., K-9 Dark gave a positive alert on Dillard's bags but did not show any interest to other items in the room.

30.     Based on these facts and our preliminary investigation on Dillard and Thomas (criminal background checks, review of airline databases, and social media analysis, described below), the other agents and I determined that it was likely that both subjects were involved in drug trafficking between Los Angeles, California and southern Mississippi. Based on this information, agents believed that the cash and jewelry possessed by Dillard were the proceeds of and/or intended to be used to facilitated drug trafficking, and therefore, were subject to seizure.

31.     Agents informed Dillard that agents would be seizing the cash and the jewelry and explained the nature of the seizure and the issues with their story and other factors associated with the seizure. Contradicting his earlier statement, Dillard then stated that the jewelry wasn't "real." However, based on the appearance and weight of the jewelry, agents believed this to be untrue.

32.     After being notified of seizure of these above items, Dillard then advised agents he would not be flying to California after all.

**EXHIBIT A**

33. Agents took custody of the Defendant Property and advised Dillard that he would be given the opportunity to contest the seizure.

### B. Anterio Dillard and Shiniqua Thomas' Criminal History

34. Agents verified criminal histories for both Thomas and Dillard via the National Crime Information Center database. Dillard had multiple prior arrests for various crimes including grand larceny, possession of a controlled substance, and contempt of court in Mississippi and felony possession of cocaine, possession of marijuana, and other drug-related offenses in North Carolina, with the latest charges appearing to occur in 2019, when he was sentenced to 12 to 24 months in prison for felony drug-related offenses.

35. Thomas has a criminal history for domestic violence in Mobile County, Alabama, and had an active arrest warrant through the Woodstock Police Department in Woodstock, Georgia, for possession of a controlled substance (marijuana). Thomas was not arrested, however, as the warrant only authorized extradition within the state of Georgia.

### C. Analysis of Dillard's Phone Numbers

36. Based on public index searches and information provided by Thomas, I identified 3 cellular phone numbers for Dillard (primary number–(910) 358-2354; possible secondary numbers--(228) 209-3559 and (228) 769-2029). I also observed, while interacting with Dillard, that he possessed 2 cellular phones, but Dillard refused to provide the numbers for his phones.

37. I checked all three phone numbers through DEA-specific indexes and determined that # 2354 had been in contact with known active distributors of illicit narcotics in late 2021 and in 2022. One of these individuals had previously been identified in investigations through the DEA Gulfport Resident Office as an active narcotics distributor who would transport bulk



**EXHIBIT A**

quantities of narcotics via airline flights utilizing third-party couriers between California and Mississippi.

38. Furthermore, # 3559 was in contact with two subjects identified in DEA Atlanta investigations as directly involved in money laundering for active drug-trafficking organizations.

    D.    **Analysis of Dillard's Social Media Accounts**

39. I conducted multiple checks of major social media platforms for Dillard to determine what public presence he had, if any, relating to his stated musical career and reported sources of income. Dillard had a Facebook.com social media account under the account name "Terio Bos Mane Dillard" with his photograph as the cover/profile image and "lilt.o.dakidd" as the username. Dillard had links and listings for other social media platforms on his Facebook.com page including Instagram, YouTube, SnapChat, Soundcloud, and Twitter, but the links for Instagram, YouTube, and Twitter were all dead links that did not send the user to Dillard's current social media pages.

40. On this account, Dillard regular posted statuses and photographs showing him in possession of large bundles of cash as well as the jewelry seized from him on the above date. Photographs shared by Dillard to his Facebook account indicated that Dillard had purchased his "TRAPZILLA" necklace in 2022, and his other jewelry primarily in 2021. Other posts by Dillard included his rap music videos and various other personal comments and shared posts.

41. I observed only one promotional post by Dillard in 2022 that indicated he was making a professional appearance as a musician. On September 2, 2022, Dillard shared an advertisement for the "Vibe Nightclub and Lounge" located in Fort Walton Beach, Florida. The advertisement was for a Labor Day event featuring "Big Boogie" with photograph of Dillard on the lower right corner of the picture and the caption "Also performing, Bosman T.O." There did



not appear to be any other similar posts shared by Dillard in the past year, which indicated a general lack of involvement in such shows.  This appeared to corroborate Thomas' statement that insinuated that Dillard did not profit extensively from his work as a rap artist.

42. A known drug trafficker "reacted" to at least one of Dillard's most recent posts, and Dillard shared a post from August 2022 by another drug trafficker, which showed the individual holding large stacks of cash.

43. On August 21, 2022, Dillard shared a post with a caption starting with "20 on my Cuban I spent 30 on my Cartier."  The bracelets seized from Dillard were Cuban brand and covered in diamonds and the watch seized from Dillard was a Cartier brand watch and also covered in diamonds.  On July 29, 2022, Dillard shared a video with a caption starting with "Lax with 60k tryna hide them bands from TSA," a statement I interpreted to mean that Dillard had been in Los Angeles Airport ("LAX") with $60,000, which he was trying to hide from TSA.  Based on the airline records regarding Dillard, I knew that he departed from Gulfport for LAX on July 16, 2022, and returned to Gulfport on July 18, 2022.  The ticket was purchased only two days prior to the flight.

44. I found an Instagram account for Dillard under the name "its_t.o," which had a total of 10 posts and 6,111 followers.  Dillard did not appear to be consistently and actively utilizing his Instagram profile.  Dillard maintained a YouTube account under the screen name, "It's T.O" with a total of 35 video uploads over six years, and approximately 97,000 total video views and 229 subscribers.  Dillard uses the screen name "Bosmane T.O." on the Spotify.com music streaming service and had a total of 5 monthly listeners.  Based on information obtained relating to ad revenue on Spotify.com and YouTube.com, these numbers would in no way provide any form of significant revenue to Dillard.

**EXHIBIT A**

E.   **Analysis of Dillard's American Airlines Records**

45.   I submitted an administrative subpoena to American Airlines for flights relating to Dillard. These records indicated that Dillard had a history of flights to Los Angeles, California from Gulfport, Mississippi.

46.   Dillard's planned flight from September 27, 2022, was a re-issued ticket from September 25, 2022. The original ticket showed Dillard leaving September 26, 2022 and returning September 28, 2022. The re-issued ticket showed Dillard leaving September 27, 2022 and returning September 27, 2022, which was clearly inconsistent with Dillard's statements regarding "going on vacation" with Thomas to Los Angeles, CA and was further inconsistent with his statement that he had booked a return flight initially and then changed his plans to stay one week, since the re-booked flight was an even shorter length of time compared to the initially booked flight.

47.   Dillard's records showed other flights of the same pattern consistent with a "fast turnaround" trip frequently associated with drug couriers.

F.   **Records for Dillard's Alleged Businesses**

48.   I checked for businesses relating to dog breeding via the North Carolina, Mississippi, and California Secretary of State business search systems, but was unable to locate any business relating to "Cutthroat Bullies Exotic Kennels," or any such company associated with "Eric Phillips," Dillard's brother. I also could not find any subjects identified as "Eric Phillips" associated with Dillard or with any such dog-breeding company.

49.   I was able to locate an North Carolina business record for "ZaZa Kennels LLC" (ID # 2458855) which listed Anterio Emetic Dillard as the registered agent, member, and organizer. The business was listed as registered on July 26, 2022, less than two months prior to



the date of seizure, and listed no other registered agents or owners. The business was registered to 810 Three Bridge Estates Circle, Lot # 31, Jacksonville, NC 28540. I used Google Maps to locate the address and observed that it appeared to be a trailer lot with multiple low-quality house trailers parked in various lots. ZaZa Kennels LLC had no verifiable social media or search engine presence, nor was the company promoted by Dillard on his social media pages.

50. I conducted various public domain searches for "Cutthroat Bullies Exotic Kennels" and "ZaZa Kennels" as well as combinations including "Anterio Dillard" and "Eric Phillips," but could not locate any information showing any association of or actual public presence for either company.

51. I was unable to locate any records indicating that Dillard ran a professional lawn care service.

V. **CONCLUSION**

52. An official count of the cash seized from Dillard totaled $22,705.00. An appraisal for the jewelry seized from Dillard resulted in a total estimated replacement value of $265,959.00.

53. Based on the above facts and circumstances, I believe that probable cause existed to seize the cash and Defendant Property as being proceeds and/or intended for the purchase of illicit narcotics. This determination was made by several factors, including, but not limited to: (1) the deceptive and anxious behavior exhibited by Dillard and Thomas; (2) the currency amount being consistent with larger scale drug-trafficking; (3) possession of controlled substances; (4) the odor of controlled substances on Dillard's luggage; (5) the insufficiency of Dillard's reported legitimate income, given his possession of multiple pieces of expensive jewelry and the cash in his possession; (6) the positive alert for controlled substances on



Dillard's bags by a certified narcotics-detecting K-9; (7) the inconsistency between Dillard's alleged travel plans and the amount of luggage and clothing he had; (8) the inconsistency of business records and Dillard's social media accounts in relation to his alleged businesses; (9) Dillard's airline records indicating flights between Gulfport and Los Angeles that are consistent with drug trafficking behavior and inconsistent with Dillard's story; and (10) Dillard's drug trafficking criminal history and association with known drug traffickers.

54. The results of this investigation support my reasonable belief that the government can meet its burden of proof that the Defendant Property is directly related to and/or derived from the illicit distribution of controlled substances. This determination was made on the facts and circumstances presented above.

55. I reasonably believe, based on the above-listed facts and circumstances, that there was probable cause to seize the Defendant Property and that the United States will meet its burden of proof to forfeit the Defendant Property. I reasonably believe that the money was intended to facilitate or used to further a drug crime or is directly related to drug proceeds of Dillard or his associates, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy) and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881.

56. I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this 19th day of December 2022,

Alexander W. Smith
Task Force Officer
Drug Enforcement Administration

**EXHIBIT A**